### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JEFFERY R. GORDON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-13-CV-662-XR |
| | § | |
| ACOSTA SALES AND MARKETING, | § | |
| INC., | § | |
| | § | |
| *Defendant.* | § | |

### ORDER

On this day the Court considered Defendant's Motion for Summary Judgment.  Docket no. 21.  For the following reasons, the Court GRANTS the motion.

## I.    BACKGROUND

Plaintiff Jeffrey R. Gordon filed this lawsuit alleging employment discrimination and retaliation under the Americans with Disabilities Act ("ADA") against Defendant Acosta Sales and Marketing, Inc., on July 22, 2013. Acosta is a sales and marketing company that helps various food and consumer product companies with their stock management, sales, and promotions at large retailers like grocery and drug stores.

### A.  Undisputed Factual Background[1]

Acosta employed Gordon as a part-time retail coverage merchandiser (an "RCM") from September 2012 to March 27, 2013, when he resigned.  Plaintiff's Deposition, docket no. 22-3, at 158.  As an RCM, Gordon traveled to the various grocery stores he was assigned in the greater-San-Antonio-area to track product sales, inform store managers about their inventory,

---

[1] For the purposes of summary judgment, Acosta is not disputing the facts from Gordon's deposition and other supporting documents.

and help promote ongoing or upcoming deals for his assigned products.  Gordon managed his own schedule, set his own hours, worked mostly alone, and did not report to an office.  *Id*. at 68-74.  He worked approximately thirty hours per week, visiting two or three stores per day.  His assigned products included items from Procter & Gamble and Kraft.

Gordon has a medical condition called edema, which causes swelling of the extremities.  To treat his condition, Gordon takes medication that is a diuretic, causing frequent urination in the six to eight hours after it is ingested.

Gordon performed his RCM job duties satisfactorily at all times relevant to this litigation.  Gordon had access to bathrooms at all times while he was working.  He was permitted breaks whenever he desired, including while traveling between his assigned stores.  *Id*. at 152-54.

In "October or November 2012" Gordon told his supervisor, Rudy Ramirez, that he had edema.  He also informed Ramirez that he would be seeking alternate employment within Acosta and Ramirez supported Gordon's decision.  Ramirez was Gordon's supervisor on the "purple team," which included other RCMs who were assigned different products or different stores.  A major Acosta client, Kraft Foods, asked Acosta to provide RCMs who would only work on Kraft products in late-2012.  Accordingly, Ramirez had Gordon train Mike Urdiales to be an RCM as part of Kraft's directive.  After training, Urdiales took Kraft responsibilities from Gordon and at least two other RCMs, Gonzalo Garza, and Eva Naranjo.  *Id.* at 82-83.

Gordon objected to Urdiales's new assignment and its impact on his own responsibilities.  Ramirez sought to expand the number of Gordon's store assignments to reflect his loss of Kraft, but Gordon did not want additional assignments for fear of the wear and tear on his vehicle the additional travel would cause.  Instead, via email on January 8, 2013, Gordon requested his hours

be diminished to twenty-four per week so he could search for alternate employment.  *Id.* at 94-95.

In response to the email, Ramirez confronted Gordon at a grocery store on January 9, 2013.  The two got in an argument.  Ramirez invaded Gordon's personal space multiple times, raised his voice, and eventually stated, "I'm your f___ing supervisor. I can tell you to do whatever I want."  *Id.* at 92-93.  Gordon immediately complained about Ramirez's conduct in an email to Ramirez's supervisor, David Osgood, and a human resources representative, Julie Conord.  Ramirez never mentioned Gordon's disability in their argument.  Gordon's email to Osgood and Conord did mention filing an EEOC charge for verbal assault and harassment, but the email did not discuss any sort of protected characteristic like Gordon's disability.  Later that day, for the first time, Gordon mentioned a "reasonable accommodation" to Conord and Osgood.  However, Gordon also stated that the accommodation he sought was to be moved away from Ramirez because of their argument and what he viewed as other problems not related to his disability.  Gordon had already applied for two administrative positions in Acosta's San Antonio office and sought a transfer.

Acosta did not provide the transfer.  They did investigate and follow-up on the altercation, disciplining Ramirez.  Acosta assured Gordon that Ramirez would not act inappropriately again, but Gordon continued to complain he was afraid of Ramirez "retaliating" for Gordon reporting his behavior to Ramirez's boss and continued to push his transfer.

There is no evidence Ramirez continued to harass Gordon after the altercation.  Though Gordon initially alleged more harassment, he later admitted the only negative action taken was Ramirez singling him out in an email about scheduling.  When Acosta's attorney showed Gordon

that an identical email had been sent to multiple co-workers at his deposition, Gordon stated Ramirez had not "done anything" to him since the January 9, 2013 altercation. *See id.* at 140.

To address Gordon's concerns that Ramirez would "retaliate" against him for reporting the altercation to his supervisors, Osgood and Harvey Shaner, another Acosta employee, met with him on February 5, 2012.  Osgood assured Gordon that Ramirez would not treat him poorly again and that there would be no "retaliation."  At this meeting, Gordon mentioned his disability to Osgood and Shaner for the first time to discuss his transfer.  Shaner took extensive notes of the meeting while Osgood spoke.  Towards the end, Shaner accused Gordon of lying about his disability in order to secure the RCM position.  Gordon was offended by Shaner's remark and terminated the meeting.  Gordon immediately complained about the meeting to Conord, stating he "expressed to Mr. Osgood that I have been diligent in continuing in a position while dealing with a medical issue," but no reasonable accommodation was offered.  *Id.* at 120.  To this point, Gordon had performed his RCM duties satisfactorily.

By February 12, 2013, Gordon determined he wanted to change the scheduling of his medications in order to better manage his edema, which would cause him to urinate with greater frequency at work.  He emailed Conord mentioning the change in medication issue, and asking for an "accommodation" that he be moved from Ramirez's supervision to an administrative position.  *Id.* at 129-134.  Conord responded by asking for Gordon to provide a doctor's note certifying his condition.  Gordon secured a note from his doctor, Dr. Quiroz.  Dr. Quiroz wrote a letter to Acosta stating that Gordon's medication caused frequent urination so he needed close proximity to a bathroom.  She did not indicate any other accommodations were necessary, and did not recommend Gordon be transferred, including to any administrative position.  *Id.* at 149-

150.  Gordon forwarded Dr. Quiroz's letter to Conord on March 22, 2013, continuing to request the accommodation of a transfer.

Acosta responded to the accommodation request on March 27, 2013, stating it could meet Gordon's accommodation in his RCM position, as Gordon had unlimited and free access to bathrooms at all times.  Acosta said using the bathroom would not impact its evaluation of Gordon's performance, and that all relevant supervisors had been made aware of the condition. *Id.* at 151.

Gordon reacted to Acosta's email negatively because he viewed it "as retaliatory in nature." He did not call or email Conord to discuss the accommodation further.  Instead, he tendered his resignation, because he "no longer had faith in [Acosta's] system" on March 27, 2013.  *Id.* at 156.

### B.  Procedural History

Despite threatening EEOC action in early January after his altercation with Ramirez, Gordon did not file an EEOC complaint for failure to provide an accommodation, hostile work environment, and retaliation, until March 29, 2013.  *See id.* at 168.  Gordon later amended his EEOC complaint to include a constructive discharge claim.  The EEOC decided not to pursue Gordon's claims further after he explained to an investigator that: 1) he always had access to a bathroom, 2) he was never told he could not take as many bathroom breaks as he needed, and 3) that Acosta had complied with his doctor's requests.  *Id.* at 171-72.

The original complaint (docket no. 1) asserts four causes of action based on Gordon's disability and treatment at Acosta: 1) failure to provide a reasonable accommodation; 2) retaliation; 3) hostile work environment; and 4) constructive discharge.  Acosta filed this motion

for summary judgment to dismiss all the causes of action on October 20, 2014.  Docket nos. 21

and 22.  Gordon responded on November 6, 2014.  Docket no. 25.

## II.    LEGAL STANDARD

A court shall grant summary judgment if the movant shows that there is no genuine issue

of any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P.

56(a).  To establish that there is no genuine dispute over any material fact, the movant must

submit evidence that negates the existence of some material element of the nonmoving party's

claim or defense.  *Lavespere v. Niagra Machine & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir.

1990), *cert. denied*, 510 U.S. 859 (1993).  If the crucial issue is one for which the nonmoving

party will bear the burden of proof at trial, the movant can merely point out that the evidence in

the record is insufficient to support an essential element of the nonmovant's claim or defense.  *Id.*

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that

summary judgment is inappropriate.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court

must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, put

differently, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury

to return a verdict for the nonmovant.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250

n.4 (1986); *Lavespere,* 910 F.2d at 178.  In making this determination, the court should review

all the evidence in the record, drawing all reasonable inferences in favor of the nonmovant and

without making credibility determinations or weighing the evidence.  *Lytle v. Household Mfg.,*

*Inc.*, 494 U.S. 545, 554–555 (1990).  The court also considers "evidence supporting the moving

party that is uncontradicted and unimpeached." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## III.    ANALYSIS

Title I of the ADA prohibits discrimination against an employee on the basis of physical or mental disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A plaintiff may establish a claim under the ADA with either direct or circumstantial evidence of discrimination.  *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995). When relying on circumstantial evidence, the claim is analyzed in the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The *McDonnell* framework has three steps: 1) a plaintiff must make a prima facie showing of discrimination; 2) if the prima facie case is made, the employer must give evidence of a legitimate, nondiscriminatory purpose for its actions; and 3) once the employer offers a legitimate purpose, the plaintiff must prove this reason was pretextual.  *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000).

### A.   Reasonable Accommodation

The definition of "discriminate" in the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5). Under *McDonnell*, a plaintiff has the burden of establishing a *prima facie* case in a failure-to-accommodate claim.  To do so a plaintiff must show: "1) the plaintiff is a qualified individual with a disability; 2) the disability and its consequential limitations were known by the covered employer; and 3) the employer failed to make reasonable accommodations for such known limitations."  *Feist v. Louisiana, Dep't of*

*Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (internal quotation marks omitted); *Gonzalez v. Texas Health & Human Servs. Comm'n*, No. 5:13-CV-183-DAE, 2014 WL 6606629, at *5 (W.D. Tex. Nov. 19, 2014).  "Qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Acosta does not dispute that Gordon is a "qualified individual with a disability," or that it is a covered employer.  This claim hinges on whether Acosta "failed to make reasonable accommodations for known limitations."

Covered employers must make "reasonable accommodations" necessary to allow an employee with a disability to perform the essential functions of his job.  42 U.S.C. § 2112(b)(5)(A).  The definitions section of the ADA states a reasonable accommodation may include,

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id*. at § 12111(9).

"An employee who needs an accommodation because of a disability has the responsibility of informing [his] employer." *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).  "When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th

Cir. 2009).[2]  "When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).  However, the interactive process is a shared responsibility and when the breakdown in communication is "traceable" to the employee, the employer is not liable.  *Id.*

"The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *Agro Distrib.*, 555 F.3d at 471. "When no reasonable accommodation can be made to the plaintiff's prior job, he may be transferred to another position." *Jenkins*, 487 F.3d at 315 (citing § 12111(9)(B)). "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." *Id.* 315-16 (citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n. 14 (5th Cir. 1997)).  "A disabled employee has no right to a promotion," or, "to choose what job to which he will be assigned." *Id.* at 316 (citing *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 622-23 (5th Cir. 2000)).

Acosta argues that it provided Gordon a reasonable accommodation, though not his preferred option, and thus his claim fails to meet the third prong of the *Feist* test.  Specifically, Acosta says it permitted Gordon to take as many bathroom breaks as he needed without negative repercussions and that there was always a bathroom available to him, whether he was in the car traveling or in a store.   Docket no. 22 at 12.   Acosta also argues that Gordon ended the interactive process because he resigned rather than reply to Conord's email with reasons or alternatives for why the offered accommodation would not suffice.  *Id.* at 13-14.

---

[2] "The accommodation, however, does not have to be the 'best' accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated . . . ."  29 C.F.R. pt. 1630, App., § 1630.9

Gordon argues that Acosta's offered accommodation was not reasonable, that there was another accommodation available, administrative assistant positions for which he applied and was qualified for, that Acosta refused to provide.  He requested a specific accommodation and Acosta's option was not the option he requested.  Gordon further argues that Acosta, not he, cut off the interactive process because Conord's response forced Gordon to "accept the accommodation offered him or quit."  Docket no. 25 at 14.

Gordon told his immediate supervisor, Ramirez, that he had edema in October or November 2012.  Gordon invoked the words "reasonable accommodation" and "specific accommodation" with Acosta employees Conord and Osgood on multiple occasions, but used the term in reference to his desire to be transferred away from Ramirez after their altercation. His desire for an "accommodation" was connected to what he viewed as intolerable behavior by his boss, not his covered medical condition.  Only after his discussion with Osgood and Shaner in early February, where Gordon felt he was treated harshly by Shaner, did Gordon connect his medical condition clearly to his "accommodation" request.  Conord immediately urged Gordon to acquire a doctor's note. Upon receipt of the doctor's note from Dr. Quiroz, which stated Gordon needed "close proximity to the bathroom facilities" but stopped short of stating he required a transfer, Acosta responded to the accommodation request.  Acosta was clear that Gordon could perform his essential RCM job duties, that he could take as many bathroom breaks in the car or at his sites as he wanted without any negative view or repercussions from the company, and that all his supervisors were aware of the condition and would not react negatively to bathroom breaks.  Plaintiff's Deposition, docket no. 22-3, at 151.  Gordon was displeased by this response, however, and resigned.

No one ever told Gordon he could not use the restroom, or that frequent use of the restroom was a problem. Both parties maintain that Gordon was able to satisfactorily meet the essential job duties of the RCM position with his disability at all relevant times, including with this "accommodation."

Acosta provided Gordon a reasonable accommodation as a matter of law. The existence of a preferred option is insufficient on its own for the claim to survive summary judgment. *See Agro Distrib.*, 555 F.3d at 471. Gordon's edema required he be in close proximity to bathrooms and be able to take bathroom breaks freely. Acosta's accommodation offered such access in his RCM position. Gordon was not entitled to his preferred option: a transfer to an administrative assistant position.[3] Gordon argues that he needed "greater" access to bathrooms, but the undisputed testimony is that he had unlimited, unfettered access to bathrooms at all times as an RCM while at work or traveling for work without fear of repercussions.

Though not advanced in the summary judgment brief, Gordon argued during his deposition that Acosta's accommodation was unreasonable because: 1) Acosta could not guarantee that he could use bathrooms at the stores when they do not control them, and 2) he did not have access immediate to bathrooms while driving. But Gordon could not recall a single time he was not able to use the public restroom when needed it at one of his assigned grocery stores. Gordon also admitted that he could stop to use the bathroom whenever he pleased while traveling car. Plaintiff's Deposition, docket no. 22-3, at 178-79.

Even if the accommodation Acosta offered Gordon was not reasonable, or he could have been provided "greater" bathroom access, Gordon's failure-to-accommodate claim fails because he ended the interactive process. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 225 (5th Cir. 2011) (holding an employee with diabetes retired and cut off the interactive his employer

---

[3] It is disputed whether Gordon was even qualified for these positions.

sent him a letter refusing his requested and preferred accommodation).  When the employee resigns, the end of the interactive process is traceable to him such that the employer is not liable. *Callies v. Donahoe*, No. CIV.A. H-12-3710, 2014 WL 4215370, at *6 (S.D. Tex. Aug. 25, 2014) (holding an employer could not be liable for failure-to-accommodate when a plaintiff ended the interactive process by not responding to the employer's most recent offer of accommodation before his termination for failing a drug test).  Gordon's subjective belief that he had "lost faith" in Acosta's process does not relieve him engaging in the interactive process.

Gordon's failure-to-accommodate claim fails as a matter of law because he was offered a reasonable accommodation and, upon learning of that accommodation but believing it unsatisfactory, he resigned his position, cutting off the interactive process.

### B.  Hostile Work Environment

Hostile work environment claims under the ADA are "modeled after the similar claim under Title VII." *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998). To prevail, a plaintiff must show:

> (1) that [he] belongs to a protected group; (2) that [he] was subjected to unwelcome harassment; (3) that the harassment complained of was based on [his] disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001).  Moreover, the disability-based harassment must "be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment."  *Id.* (quoting *McConathy*, 131 F.3d at 563).

Acosta argues Gordon's hostile work environment claim should be dismissed because he was subjected to one inappropriate altercation with a supervisor that was not based on his disability. Additionally, Acosta argues the treatment was not severe and pervasive, as it amounted to nothing more than one disagreement among coworkers that is not legally actionable. Gordon argues his supervisor, Ramirez, was aware of his disability, singled him out because of that disability, and failed to support and train Gordon.

Gordon's hostile work environment claim fails for several reasons.  First, the harassment he complains of was not due to his disability.  The altercation between him and Ramirez was due to Gordon's complaints and objections to a change in job responsibilities for a legitimate business reason and Ramirez's reaction to those objections.  This episode was not related to Gordon's disability, as his conversations with HR and in his deposition in this case make clear.

Next, the claim fails because the harassment was not pervasive or severe enough to alter the conditions of his employment.  According to Gordon's own deposition, Ramirez did not take any further negative action against him after their altercation.  In early 2013, Gordon was concerned Ramirez would retaliate against him for reporting their altercation to Ramirez's supervisors, but there is no evidence to allow a reasonable trier of fact to find Ramirez did anything else that could objectively be called harassment.

Gordon argues in his brief that Ramirez continued to "single him out" and "accus[e] him of not scheduling his stores" in an accusatory tone.  This is a reference to one email where Ramirez told Gordon to schedule his stores.  However, when confronted at his deposition with multiple emails from the same date to coworkers worded the exact same way, and after admitting that he had not actually scheduled his stores due to a software malfunction, Gordon could not maintain his claim of being singled out.  Plaintiff's Deposition, docket no. 22-3, at 134-141.

One altercation not related to his disability is not enough to show harassment pervasive or severe enough to survive summary judgment. *See McConathy*, 131 F.3d at 564 ("It is a simple fact that in a workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or "cold-shouldering" to the level of an actionable offense."); *Staples v. Caremark, L.L.C.*, No. CIVA SA-08-CV-831-XR, 2009 WL 3634079, at \*4 (W.D. Tex. Oct. 29, 2009) (three incidents of a supervisor specifically doubting a plaintiff's disability and its impact on his work not severe enough to survive summary judgment).

Lastly, even if the Ramirez altercation was due to Gordon's disability, Acosta took quick and decisive action to remedy the problem when it investigated and disciplined Ramirez. And, as stated above, no further harassment or incidents occurred after the discipline. No reasonable trier of fact could find Gordon was subjected to a hostile work environment given the summary judgment evidence. Therefore, Acosta is granted summary judgment on this claim.

### C. Retaliation

The *McDonnell* framework also applies to retaliation claims. *See Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996). In order to establish a *prima facie* case for retaliation a plaintiff must be able to show that 1) he engaged in activity protected by the ADA; 2) that he suffered an adverse employment action; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008). Gordon argues that by threatening to take his complaints about Ramirez following their altercation to the EEOC on January 9, 2014, the subsequent "adverse employment actions" he suffered were causally related to the threat. The adverse employment action here, he argues, was the refusal of the "reasonable accommodation."

14

In his email to Osgood and Conord, Gordon only reported inappropriate behavior by Ramirez that arose after Gordon objected to Ramirez's supervisory decisions.  Gordon was not claiming that the incident occurred because of his disability, and neither Osgood nor Conord knew about his disability at that time.  Gordon was making threats because he felt he was verbally assaulted.  He cannot be said to have opposed an unlawful employment practice when the employer had no reason to believe Gordon was complaining about illegal discrimination.  *See Alack v. Beau Rivage Resorts, Inc.*, 286 F. Supp. 2d 771, 775 (S.D. Miss. 2003) ("Although express complaints to supervisors about perceived discriminatory practices constitute protected activity, the "wide range" of protected activity clearly does not include those situations where the opposition relates not to unlawful employment practices but to a personal grievance.") (quoting *Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 559–60 (D. Kan. 1995)).  Gordon further confirmed that he was not complaining about illegal discrimination in later discussions with Osgood and Conord when he never linked his concerns about Ramirez's behavior or "retaliation" to his edema.  Gordon's concerns were ordinary workplace issues and personal grievances; any connection to his disability in this case was made *post hoc* and then immediately addressed when it was raised.

Second, assuming Gordon did engage in protected activity, Gordon did not suffer an adverse employment action.  As discussed above, Acosta did not refuse him a reasonable accommodation or create a hostile work environment.  Gordon admitted during his deposition that Ramirez took no other negative action toward him after their altercation.

Third, even if Acosta did take adverse employment action and Gordon's threat to go to the EEOC for verbal assault was a protected activity, he could not show a causal connection between the two.  Gordon has offered no facts and there is no evidence to support a causal

connection between the threatened EEOC complaint and any negative actions taken towards him aside from Gordon's subjective belief. *Jones v. CVS Pharmacy, Inc.*, No. CIV A 3:07-CV-1383-L, 2009 WL 1904842, at *6 (N.D. Tex. July 2, 2009), *aff'd*, 392 F. App'x 275 (5th Cir. 2010). In fact, Conord worked with him extensively, and Acosta assured him that Ramirez would take no further negative action toward him. Therefore, Acosta is granted summary judgment on the retaliation claim.

### D. Constructive Discharge

Gordon has the burden of showing constructive discharge. *See Jurgens v. Equal Employment Opportunity Commission,* 903 F.2d 386, 390–91 (5th Cir. 1990). To establish a constructive discharge claim, Gordon must show that his working conditions were "so intolerable that a reasonable employee in [his] position would [have felt] compelled to resign." *Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 331 (5th Cir. 2004) (internal citations omitted). Courts consider the following factors when determining whether a reasonable employee would feel compelled to resign: 1) demotion; 2) reduction in salary; 3) reduction in job responsibilities; 4) reassignment to menial or degrading work; 5) reassignment to work under a younger supervisor; 6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or 7) offers of early retirement or continued employment on terms less favorable that the employee's former status. *See Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir. 2001) (*citing Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir. 2000)). Proof of "constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.,* 512 F.3d 157, 167 (5th Cir. 2007) (citing *Kinney Shoe,* 237 F.3d at 566). Aside from arguably reduced job responsibilities, which Gordon himself insisted upon after Ramirez suggested only a

change in his responsibilities, Gordon shows none of the factors courts consider for constructive discharge. *See Kinney Shoe Corp.,* 237 F.3d at 566.  Additionally, the Court found Gordon was not subjected to an actionable hostile work environment above.

Gordon cites a Tenth Circuit case to argue his constructive discharge claim should survive because Acosta offered him a "Hobson's Choice" of equally intolerable options which would have caused him to be worse than the status quo.  *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 467-68 (10th Cir. 1990).  *Mitchell* cites *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 193 (5th Cir. 1988) for the proposition that such a choice is sufficient evidence to support a constructive discharge claim.  Notwithstanding that *Mitchell* and *Bodnar* are forced retirement constructive discharge cases, Acosta did not offer Gordon two equally intolerable options that were worse than the status quo.  In fact, they offered him the status quo plus additional assurances he could continue to take breaks as often as he needed.    Therefore, the Court finds as a matter of law that Gordon was not constructively discharged because he has demonstrated none of the *Kinney Shoe* factors and his claims for hostile work environment already failed.

## IV.    CONCLUSION

For all of the above stated reasons, the Court GRANTS Defendant's motion for summary judgment.  Docket no. 21.  Plaintiff shall take nothing by his claims and his claims are dismissed on the merits. Judgment in favor of Defendant shall issue separately according to Rule 58. Defendant is awarded costs and shall file a bill of costs pursuant to the local rules.

It is so ORDERED.

SIGNED this 22nd day of December, 2014.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE